UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JONATHAN WASHBURN,

                            Plaintiff,

        -against-                                          5:15-cv-0955 (LEK)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                            Defendant.

_____

## DECISION and ORDER

## I.    INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 16 ("Plaintiff's Brief"); 17 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is vacated and remanded.

## II.   BACKGROUND

        On November 19, 2010, Plaintiff Jonathan Washburn ("Plaintiff") filed an application for

Supplemental Security Income ("SSI") payments, alleging disability beginning on November 1,

2000.  See Dkt. No. 12 ("Record") at 409.[1]  The application was denied on April 6, 2011.  R. at 80.

On June 2, 2011, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ").

R. at 85.  On May 8, 2012, Plaintiff and counsel appeared for a hearing before ALJ John P. Ramos

("Ramos"), who presided over the hearing in Syracuse, New York.  R. at 62.  On August 6, 2012,

Plaintiff, represented by counsel, appeared for a second hearing before ALJ Ramos.  R. at 34.  The

ALJ's decision denied the claim for benefits on September 4, 2012.  R. at 10.  Plaintiff requested

_____

        [1] Citations to the Record use the pagination assigned by the SSA.

review by the Appeals Council on September 19, 2012. R. at 8. This request was denied on October 29, 2013, making the ALJ's decision the Commissioner's final decision. R. at 1. Plaintiff then filed a civil action in the Northern District of New York, where the Court remanded the case to the agency on August 21, 2014, for further administrative proceedings. R. at 500. The SSA agreed to redetermine Plaintiff's residual functional capacity ("RFC") and more closely evaluate claimant credibility, referencing opinions of medical and vocational experts. R. at 409. Plaintiff appeared with counsel for a hearing before ALJ Ramos in Binghamton, New York, on April 7, 2015. R. at 432. Vocational Expert Don Schader ("VE Schader") was also present. Id. The ALJ denied the claim for benefits on June 1, 2015. R. at 406. Plaintiff then filed the present action on August 5, 2015. See Dkt. No. 1 ("Complaint").

### A. Plaintiff's Medical Records and History

Plaintiff was born on December 31, 1974. R. at 298. In school, he was assessed as having a learning disability and required special education classes, remedial courses, and other accommodations. R. at 36; Pl.'s Br. at 2. Plaintiff dropped out of high school in twelfth grade. R. at 36. Plaintiff worked inserting pages into newspapers, as a diesel mechanic for a trucking business, and at McDonald's. R. at 37. Plaintiff's total earnings from 2000 to 2002 were less than $10,000, and he has not worked since 2002, except for a brief period of self-employment doing lawn care that ended with his back injury and alcohol abuse treatment. R. at 191, 343. Plaintiff quit his positions as a mechanic and at McDonald's after feeling that he had too many supervisors and was confused by their instructions. R. at 37-38. He quit his newspaper job after feeling that he "couldn't do it anymore." R. at 45. Plaintiff's periods of employment typically lasted less than a year. R. at 220. Plaintiff is divorced. R. at 49.

Plaintiff has a history of alcohol abuse and dependence. R. at 290. He did have a driver's

license, which he earned with assistance during a five-hour course and driving exam.  R. at 57.  After a DWI, his license was suspended.  R. at 47.  He has also received treatment for alcohol dependence at the Addiction Center of Broome County ("ACBC") and New Horizons.  R. at 47-48.  He has been a heavy smoker in the past but decreased his usage to three cigarettes a day in 2012.  R. at 41. Plaintiff has also had asthma throughout his life, but as of 2011 had no recent attacks or emergency room visits.  R. at 348.

The impairments that Plaintiff seeks to establish as a basis for SSI payments are intellectual impairments including cognitive disability, mental health issues including depression and Bipolar I disorder, and a back impairment.

### 1. Cognitive/Intellectual Impairments

Plaintiff has recently resided with his father, then with his brother and sister-in-law, and as of 2015, his girlfriend, her daughter, and her mother.  R. at 38, 48, 435-36.  When Plaintiff lived with his brother and sister-in-law, they took care of the household chores, grocery shopping, and necessary paperwork.  R. at 38-40.  Plaintiff had the paperwork and mail read to him, as he was unable to manage it himself.  R. at 38.  He stopped receiving Medicaid because of his difficulties with the recertification paperwork.  R. at 47.  He accompanied his sister-in-law to the grocery store and contributed to the discussion of purchases and prices.  R. at 40.  He claimed that he did not know how to use public transportation.  R. at 38.  He did help with some housecleaning tasks, though not all.  R. at 39.  His hobbies included playing games on Facebook and watching his brother work.  R. at 42, 52.  Currently, Plaintiff resides with his girlfriend, where his activities include going to the grocery store nearby.  R. at 437.  He received Medicaid and Fidelis insurance with the assistance of his father.  R. at 440.

During his substance abuse treatment at the ACBC, Plaintiff received a diagnostic assessment

3

on April 7, 2009, by clinician Cynthia Jenkins, A.S. R. at 290. Jenkins assessed Plaintiff as having "average intelligence," and listed being a "smart person" as one of his assets. R. at 291-92.

On March 18, 2011, Sara Long, Ph.D., conducted a psychiatric evaluation of Plaintiff and provided the following analysis of Plaintiff's cognitive functioning: "Mr. Washburn appears to be functioning on a below average intellectual level with a limited fund of information." R. at 343, 345. His judgment and insight were assessed as poor. R. at 345. His spelling was also deficient. Id. Dr. Long reported that Plaintiff could understand and follow simple directions, as well as maintaining concentration, attention, and a regular schedule, but decision-making and learning new tasks and instructions could present difficulties. R. at 345. Dr. Long did not rule out a learning disability. R. at 346.

Dr. M. Apacible, the State Agency reviewing psychiatric examiner, completed a Medical Source Statement of Ability to do Work-Related Activities (Mental Residual Functional Capacity ("RFC") assessment) on March 31, 2011. R. at 376. Dr. Apacible evaluated Plaintiff as having "average intelligence" but "functioning on a below average intellectual level" with problems with judgment and insight. Id.

Christina Caldwell, Psy.D., conducted an intelligence evaluation of Plaintiff on May 14, 2012. R. at 387. Applying several IQ-testing measures, Dr. Caldwell reported that, according to the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"), Plaintiff had a reading/decoding score of 60 and 2.6 grade equivalent. R. at 388. The Wechsler Adult Intelligent Scale, Fourth Edition ("WAIS-IV") resulted in a full scale IQ of 62, placing Plaintiff in the mental retardation range. R. at 388-89. Plaintiff's verbal comprehension IQ was 61, his perceptual reasoning IQ was 77, his working memory IQ was 60, and his processing speed IQ was 71. R. at 389.

4

Dr. Caldwell assessed Plaintiff as being "limited in his ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress." R. at 390. According to Dr. Caldwell, Plaintiff exhibited mild mental retardation. Id. She stated that Plaintiff's cognitive deficits would make interacting with others difficult and would have a marked effect on his ability to respond appropriately to events and changes in a work environment. R. at 393. Dr. Caldwell also concluded that Plaintiff was not able to manage his own finances. R. at 390.

Upon remand, the ALJ consulted a medical expert, Chukwuemeka Efobi, M.D., who completed an interrogatory upon review of Plaintiff's medical records on December 18, 2014. R. at 645, 652. Dr. Efobi never personally examined Plaintiff. R. at 647. According to Dr. Efobi, Plaintiff had "possible borderline or mild intellectual disability." Id. Dr. Efobi noted that, though Plaintiff had been placed in special education classes in school, no intelligence testing had been done before age twenty-two. R. at 649. Plaintiff's IQ test by Dr. Caldwell was conducted when Plaintiff was thirty-six years old. R. at 389, 647. Dr. Efobi concluded that Plaintiff did not meet the criteria of SSA Listing 12.05, which covers intellectual disabilities, but did not provide any specific evidence supporting his opinion. R. at 651.

### 2. Psychiatric/Mental Impairments

In Plaintiff's initial screening at the ACBC treatment center on April 7, 2009, Cynthia Jenkins, A.S., reported that Plaintiff had loss of appetite, slept a lot, problems with short and long term memory, and a history of substance abuse. R. at 292. At his discharge from the ACBC program on December 30, 2010, Credentialed Alcoholism and Substance Abuse Counselor and primary clinician Thomas Aicken reported that Plaintiff had major depressive disorder. R. at 378.

5

Dr. Apacible's March 31, 2011 assessment described Plaintiff as having "appropriate affect" and euthymic mood. R. at 376. Plaintiff's attention, concentration, and memory skills were intact, but he had problems with memory recall (both short- and long-term). Id. Dr. Apacible also noted Plaintiff's depression and continuing substance abuse, but stated that "in spite of abuse he is capable of sustaining a normal workday/week and can maintain a consistent pace to do at least unskilled work." Id. Dr. Apacible stated that Plaintiff had moderate limitations in respect to his ability to understand, remember, and carry out detailed instructions. R. at 374. He also had moderate limitations in performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, being aware of normal hazards, taking appropriate precautions, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others. R. at 374-75. In regard to all other workplace scenarios listed, Plaintiff had only mild limitations. Id.

Dr. Long's March 18, 2011 psychiatric evaluation reported loss of appetite and difficulty sleeping. R. at 343. His appearance was well-kept, his eye contact was appropriate, his speech was fluent and adequate, and his thought process seemed coherent and goal-directed. R. at 344. His affect was appropriate, though somewhat flat with indications of depression, and his mood was euthymic. Id. Dr. Long diagnosed Plaintiff with "dysthymic disorder" and substance abuse. R. at 346. She did not rule out social anxiety. Id. Although he was capable of using adequate stress management techniques, Dr. Long stated that Plaintiff usually used avoidance, had low self-esteem, and lacked direction and motivation. R. at 346. Dr. Long reported her conclusions to be "consistent with . . . psychiatric and cognitive problems, which may interfere with [Plaintiff's]

6

ability to function on a regular basis." Id. Dr. Long recommended psychotherapy "to build confidence and self esteem." Id.

Jenna Hubbard, FNP, met with Plaintiff on November 10, 2014, when Plaintiff was establishing healthcare after regaining insurance. R. at 661. He had not seen a psychiatrist for years. Id. FNP Hubbard assessed him as having a "normal mood and affect," as well as normal speech, behavior, judgment, thought content, memory, and cognition. R. at 662. She referred him for an Abilify prescription for Bipolar I Disorder. R. at 663. Consistently, during a November 21, 2014 appointment regarding Plaintiff's back impairment, Brian Berry, RPA, noted bipolar disorder as one of the Plaintiff's "secondary diagnoses." R. at 709.

The ALJ's medical expert, Dr. Efobi, found that Plaintiff had a possible depressive disorder, but that the diagnosis lacked supportive evidence. R. at 647, 649. He also noted alcohol dependence and abuse. Id.

### 3. Back Impairments/Physical Limitations

Plaintiff has repeatedly reported back pain. He claims that the condition started after a lifting injury. R. at 697. He has stated that it makes sleeping difficult, such that he has to get up and walk around because he cannot "get comfortable." R. at 42. In 2015, he stated that several of the discs in his back were out of place and that he had arthritis and pinched nerves being treated by injections. R. at 438.

Edward Southard, M.D., conducted an internal medical examination of Plaintiff on March 18, 2011. R. at 348. Plaintiff reported that the pain started in his lower back, radiated upwards, and was worsened by sitting. R. at 348. It was improved by standing or lying down. Id. There were no recent evaluations or MRIs. Id. Plaintiff regularly described his pain as a seven out of

ten. Id. Dr. Southard concluded that Plaintiff was suffering from lower back pain. R. at 350. Dr. Southard reported that the Plaintiff's cervical spine and thoracic spine were in normal condition. Id. The lumbar spine's flexion was limited to forty degrees, but it had full extension, full lateral flexion bilaterally, and full rotary movement bilaterally. Id. There was point tenderness in the L2-L5 (lumbar vertebrae) region. Id. Dr. Southard stated that Plaintiff's medications included albuterol puffs, Singulair, and Advil. R. at 348.

On March 29, 2011, Single Decision Maker B. Lightner conducted a physical RFC assessment. R. at 69. Plaintiff alleged a diagnosis of lumbago, resulting from a fall and deconditioning/muscle weakness. R. at 65. Plaintiff had a limited range of motion of lumbar spine, soft tissue swelling over L2-L4 (lumbar vertebrae), but an X-ray showed "essentially no acute disease." R. at 65. Lightner found that Plaintiff had "extremely minimal anterior spurs in lower lumbar spine" and possible "slight straightening of the usual lordosis." Id. Range of motion of the lumbar spine was limited, with point tenderness at the L2-L5 region. R. at 66. Straight leg raises were negative bilaterally, and Plaintiff had full range of motion of upper and lower extremities. Id. Lightner's report on exertional limitations found that Plaintiff could occasionally lift and/or carry up to fifty pounds, frequently lift and/or carry up to twenty-five pounds, stand and/or walk (with normal breaks) for about six hours in an eight hour workday, sit (with normal breaks) for about six hours in a normal workday, and push/pull (including operation of hand or foot controls) without limit. R. at 65. Plaintiff had complained of a "bad hip and back" that limited his walking; he also claimed that he got out of breath climbing stairs. R. at 68. Lightner stated that Plaintiff's "allegations of functional limitations are found to be partially credible but not to the degree that [Plaintiff] alleges." R. at 68. Lightner reported that Plaintiff "can walk for an hour before he has to stop and rest," and can also ride in a car or on a bicycle. Id.

Lightner did, however, find "more severe physical limitations" than Dr. Southard had previously found.  Id.

Between 2011 and 2014, there were gaps in Plaintiff's records because he did not have insurance.  R. at 661.  On November 10, 2014, Plaintiff met with FNP Hubbard.  Id.  She reported that Plaintiff has had back pain since 2000 and was injured when a brick fell on him.  Id.  She found that he had pain, tenderness, and spasms in the lower back, but no limited range of motion, bony tenderness, or swelling.  R. at 662.  She recommended Plaintiff to physical therapy, light stretching and icing, physiatry (pain clinic), and Flexeril for pain.  R. at 663.

Rudolph Buckley, M.D., a spine surgeon, was the attending physician at an X-ray of Plaintiff on November 11, 2014.  R. at 696.  Dr. Buckley found that the lumbar spine showed "a slight tilt to the left and AP view with 5 lumbar vertebrae," and that the pelvis was "mildly higher on the left than the right."  Id.  However, the intervertebral disc space was "well-preserved," and Dr. Buckley reported "no acute findings."  Id.

RPA Berry consulted with Dr. Buckley during a November 21, 2014 meeting with Plaintiff. R. at 710.  Plaintiff reported that his back pain "initially started with low back pain and left leg pain but now the pain radiates to the back of the neck and mid back region."  R. at 706.  Plaintiff claims pain in walking and sitting; he can only sit for fifteen minutes and standing improves his pain, as does lying on his right side.  Id.  Dr. Buckley and RPA Berry's report concluded that Plaintiff had "[c]hronic neck and back pain [and] evidence of left knee pain with painful range of motion of knee and hip."  R. at 709.  Plaintiff also had an antalgic gait, an absent right ankle reflex, and Dr. Buckley could not "rule out degenerative changes of the cervical and lumbar spine."  Id.

Dr. Buckley referred Plaintiff to Paul Badami, M.D., for a December 5, 2014 appointment. R. at 680. Dr. Buckley also recommended pain management and was the requesting physician for Plaintiff's February 4, 2015 appointment with John Minor, D.O. R. at 697.

Dr. Badami assessed Plaintiff on December 5, 2014, at Community Memorial Hospital. R. at 695. Dr. Badami reported that Plaintiff had "mild spondylosis with some endplate hypertrophy from C3-4 through C5-C6," "mild ventral thecal effacement," and "central and left paracentral herniation of the C6-7 disc which compresses the cord in the midline and left of [the] midline and could affect the left C7 nerve root." Id. Plaintiff also suffered spasms. R. at 661.

Plaintiff met with Dr. Minor on February 4, 2015. R. at 697. Plaintiff complained that his pain "increases with sitting, walking, bending, and lifting and decreases if standing in [one] place but not moving, leaning to the right side, with taking a hot shower, and changing positions including lying on the right side." Id. Dr. Minor diagnosed Plaintiff with back pain, lumbar; degenerative disc disease, lumbar spine (herniated lumbar disc); and spondylosis, lumbar without myelopathy. R. at 699. Additionally, Dr. Minor assessed Plaintiff as having "multilevel facet arthropathy of the lower lumbar spine, primarily moderate L4-5 versus mild L3-4 and L5-S1; small left lumbar disc protrusion L4-5 by MRI . . . lower L4 reactive endplate edema secondary to stress reaction or Modic type changes associated with early degenerative disc disease by MRI . . . chronic low back pain." R. at 699-700. Plaintiff had appointments with Dr. Minor on February 24, 2015, and March 19, 2015, for pain injection and follow-up. R. at 673. Lumbar blocks were administered for pain. R. at 701.

Plaintiff had a follow-up appointment with FNP Hubbard on February 9, 2015. R. at 666. Plaintiff did not feel that the Flexeril was helping. R. at 665. Plaintiff claimed that his pain was an eight out of ten. R. at 670. FNP Hubbard noted that the Flexeril was being increased. Id. She

also reported that he had myalgia.  R. at 665.  FNP Hubbard noted that Plaintiff was meeting with Dr. Buckley, who might prescribe injections for Plaintiff's pain.  Id.

Dr. Buckley produced a physical therapy requisition on February 26, 2015, to reduce Plaintiff's back pain.  R. at 675.  As of 2015, Dr. Buckley reported that Plaintiff's medications included albuterol, Nicorette, Abilify, Symbicort, and cyclobenzaprine.  R. at 727.

## B. ALJ Hearing

Plaintiff became insured in 2014 and received primary care at Bassett Health Care.  R. at 433.  During the ALJ's examination of Plaintiff on April 7, 2015, the ALJ established that Plaintiff had previously testified in 2012.  R. at 434.  Since the 2012 hearing, Plaintiff stated that he had not done any work or volunteer work because of the issues with his back.  R. at 435.  Plaintiff no longer resided with his brother and sister-in-law, but since late 2014 had lived with his girlfriend, her daughter, and her mother.  R. at 435-36.  His girlfriend was unemployed, and Plaintiff testified that they were currently living on Medicaid and food stamps.  R. at 436.  He did not receive cash assistance, since there was a dispute over whether or not he could work.  Id. Plaintiff's girlfriend had problems with her hips and back and had undergone many surgeries.  R. at 436-37.  The girlfriend's child was five years old and very healthy.  R. at 437.  Plaintiff's current residence was a two-bedroom trailer.  Id.  Plaintiff did not have a driver's license because of a history of DWIs but walked to the grocery store nearby and had Medicaid transportation as well as help from family members.  R. at 437-38.  He did not need to take care of lawn maintenance or snow removal because the owner of the land provided it.  R. at 438.  The ALJ further questioned Plaintiff about his medical conditions.  R. at 438, 446.  Plaintiff claimed that his lower back (L3, L4, and L5 discs) was "out of place."  R. at 438.  He said that he had arthritis in his back and neck, pinched nerves, and that he was receiving pain injections.  Id.  At the time of

the hearing he had Fidelis insurance.  R. at 439.  Plaintiff stated that in 2012, he was still using medication for his bipolar condition that he had obtained from treatment at ACBC, since he had no other insurance.  R. at 446.  Plaintiff would take the bipolar medicine every month or so.  R. at 448.  Plaintiff continued to use asthma medicine (inhalers) and patches for smoking, since he was trying to quit.  R. at 447.  Since his time at ACBC, Plaintiff had no other alcohol treatment and claimed that he had not had problems with alcohol since before the last hearing.  R. at 448-49.

Plaintiff's attorney also examined Plaintiff.  R. at 440.  Plaintiff stated that he was not able to get insurance while he lived with his brother and sister-in-law because their house was in foreclosure and he could not fulfill the landlord requirements for Medicaid.  Id.  Plaintiff was able to get Medicaid with his father's help.  Id.  Plaintiff applied in August 2014 and received coverage through Fidelis in November 2014.  Id.  Plaintiff had trouble sleeping and was involved in a sleep study assessment.  R. at 441.  Plaintiff drank a lot of coffee during the day to make up for his lack of sleep.  R. at 442.

Plaintiff received pain injections for his back from Dr. Minor in 2015.  R. at 442, 701.  He claimed that his back problems started in 2001, and that sitting was painful even after fifteen minutes or so.  Id.  Plaintiff could stand without pain.  Id.  Walking for more than about twenty minutes would cause pain.  R. at 444.  Plaintiff could "hardly" bend over and claimed that he could not lift objects off the ground.  Id.  Plaintiff testified that he could sit and fold clothes without difficulty, clean house and vacuum, but not lift heavy objects over twenty pounds.  R. at 444-45.

Plaintiff claimed that he had also been referred to a psychological source and was going to Whitesboro, New York, two days after the hearing, to obtain more medication for his bipolar disorder.  R. at 445.

The ALJ questioned Don Schader, the vocational expert requested by the District Court upon remand. R. at 451. The ALJ provided hypothetical RFCs to VE Schader for the purpose of finding unskilled work that an individual with the provided RFC and limitations could perform. Id. The first hypothetical situation was an individual with no exertional limitations, but with a limited ability to understand simple instructions and perform simple tasks, keep with a regular schedule, and deal with simple environmental factors. Id. Using occupations defined in the Dictionary of Occupational Titles ("DOT"), VE Schader testified that the individual in that situation could do the job of a cleaner II or a cleaner, housekeeping. R. at 452. VE Schader also stated that the individual could be a hand packager. Id.

When the hypothetical RFC was modified so that the individual had sedentary exertional limitations along with those non-exertional limitations previously stated, VE Schader stated that the individual could be a document preparer, an eyeglass polisher, or a food beverage order clerk. R. at 453. This list was non-exhaustive. Id. With the added factor that Plaintiff must avoid frequent exposure to temperature extremes and respiratory irritants, VE Schader claimed that he would not eliminate the sedentary jobs he had listed and would only definitely preclude the job of cleaner II. R. at 454. There would be some diminishment of an individual's ability to perform the job of the cleaner, housekeeping or hand packager depending on the work environment. Id.

VE Schader testified that with unskilled work, such as the six jobs mentioned, time off task outside of scheduled breaks and lunch must not exceed ten percent, and unscheduled absences per month must not exceed one day. R. at 455. The claim regarding time off task was taken from research on that particular topic; the claim regarding unscheduled absences was consistent with the DOT and its companion publication. R. at 455.

Plaintiff's counsel also questioned VE Schader.  R. at 456.  VE Schader stated that the job of a document preparer has a language level of two and a reasoning level of three.  Id.  VE Schader acknowledged that the equivalent of a third-grade reading level would not satisfy the language level of two, thus removing the job of document preparer and order clerk.  R. at 457.

### C. Procedural History

ALJ Ramos issued an unfavorable decision on June 1, 2015, finding that Plaintiff had not engaged in substantial gainful activity since the application date of November 19, 2010.  R. at 411, 423.  The ALJ found Plaintiff's severe impairments to be borderline intellectual functioning, asthma, and back pain secondary to degenerative disc disease.  R. at 411.  The only new medical source statement was from medical expert Dr. Efobi.  R. at 412.  The ALJ gave Dr. Efobi's opinion significant weight "based upon program and professional expertise and ability to review the entire medical record."  Id.  Severe chronic back pain was only marginally supported by medical evidence, but recent medical notes showed minimal degenerative findings, leading the ALJ to classify it as a severe impairment.  R. at 411.  The ALJ found that his previous finding in the original decision (pre-remand) of mild mental retardation as a severe impairment could not be sustained in light of the findings of Dr. Efobi, the medical expert.  R. at 412.  Further, Plaintiff had never been diagnosed with mental retardation in school, only a learning disability.  Id.  The ALJ stated that school records did not place him at the third-grade level reading ability, as Plaintiff claimed; he was "only somewhat below [his actual grade] level" in 1993 (the date of his last assessment).  Id.  Plaintiff's asthma had previously been ruled non-severe but because Plaintiff was taking ongoing medication, the ALJ found it to be severe as well.  Id.  The ALJ did not find Plaintiff's bipolar disorder to be severe because he was not compliant with regular treatment or prescribed medication use.  Id.  Plaintiff's history of alcohol dependence/abuse was not

14

significant in the medical record at the current time and would not be eligible for benefits. Id. Sleep apnea was irrelevant because it did not meet the Social Security Act's durational requirements and did not cause any functional limitation. Id.

The ALJ reviewed the March 18, 2011 internal medical examination by Dr. Southard and gave significant weight to Dr. Southard's opinion with respect to Plaintiff's physical activity because Dr. Southard's report was consistent with his examination and the objective record. R. at 413. The ALJ accorded less weight to Dr. Southard's opinion regarding Plaintiff's problems with respiratory irritants because Plaintiff had not seen a doctor or had to refill his medications, and he continued to smoke. Id.

The ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I; R. at 413. Plaintiff's mental impairments, singly and in combination, did not meet or medically equal Listing 12.04. Id. The paragraph B criteria were not met because Plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." R. at 414. The ALJ also considered the paragraph C criteria but found that evidence did not establish the presence of those criteria. Id.

The ALJ considered the entire record to analyze Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC for "at least sedentary work" with the nonexertional limitation of avoiding respiratory irritants. R. at 414. Plaintiff remained able to meet simple expectations and deal with simple challenges in a work environment. Id. The ALJ stated that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence,

based on the requirements of 20 CFR § 416.929 and SSRs 96-4p and 96-7p" along with "opinion evidence in accordance with the requirements of 20 CFR § 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." R. at 414. The ALJ found that Plaintiff's "medically determinable impairments could be reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. at 416.

In examining credibility, the ALJ reviewed Plaintiff's consultations with Dr. Long, Dr. Caldwell, and the treatment center ACBC. R. at 416-19. The ALJ gave significant weight to the opinion of Dr. Caldwell regarding Plaintiff's limitations based on his low cognitive scores but noted that Plaintiff worked full-time for a year and quit because of his back problems, not because of his inability to interact with others. R. at 419-20. The ALJ also found that Dr. Long's medical source statement stated that Plaintiff was not disabled, but his "substance abuse, psychiatric, and cognitive problems would interfere [with Plaintiff's] ability to function on a regular basis." R. at 420. Low intellectual functioning was the only mental impairment documented in the record. Id.

The State Agency reviewing psychiatric examiner, Dr. Apacible, evaluated Plaintiff's mental RFC with a medical source statement on March 31, 2011. R. at 420. Dr. Apacible concluded that Plaintiff "was capable of sustaining a normal workday/week and maintain[ing] a consistent pace" in at least unskilled work. R. at 421. The ALJ gave considerable weight to the opinion of Dr. Apacible because it was consistent with the objective evidence in the record. Id.

Plaintiff's family and friends provided their opinions about Plaintiff's struggle with daily activities due to back pain. R. at 421. The ALJ gave careful consideration to their sincere opinions but concluded that they were not supported by objective medical evidence. Id. The ALJ

also noted reports from Dr. Raciti, showing ongoing management of asthma (despite continued smoking) and possible sleep apnea that warranted no functional limitations. R. at 421.

Dr. Minor's recent notes showed "radiological proof of some mild lumbar degenerative changes" but no indication of how much work activity was precluded on that basis, except in regard to some reasonable restriction on heavy lifting/carrying. R. at 421-22. The ALJ stated that Brian Berry, RPA, further supported this finding through his April 2015 reports of continuing pain-treatment physical therapy. R. at 422.

The ALJ found that Plaintiff had at least a high school education, and was able to communicate in English. R. at 422. The ALJ also found that Plaintiff had no past relevant work experience, because no work was ever sufficiently sustained. Id. The ALJ found that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled, whether or not Plaintiff has transferable job skills. R. at 422. Finally, the ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that Plaintiff could perform. Id. The ALJ found that the vocational expert's testimony was consistent with the information in the DOT. Id. Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. R. at 423. Therefore, the ALJ concluded that Plaintiff was not disabled under the SSA. Id.

## III.   LEGAL STANDARD

### A.  Standard of Review

When a court reviews an ALJ's final decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the

record. 42 U.S.C. § 405(g); <u>Roat v. Barnhart</u>, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a de novo review." <u>Sixberry v. Colvin</u>, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support the decision, but it is not clear that the ALJ applied the correct legal standards. <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

## B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." <u>De Leon v. Sec'y of Health & Human Servs.</u>, 734 F.2d 930, 935 (2d Cir. 1984) (quoting <u>Gold v. Sec'y of Health, Educ. & Welfare</u>, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008) (quoting <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is

disabled or not disabled at any step, the evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed to the next step.  Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If it does, the claimant is not disabled under SSA standards.  Id.  At step two, the SSA considers whether the claimant has a severe, medically determinable physical or mental impairment, or a combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509.  Id. § 404.1520(a)(4)(ii).  If he or she does not have such an impairment, the claimant is not disabled under SSA standards.  Id.  At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. I.  Id. § 404.1520(a)(4)(iii).  If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work.  Id. § 404.1520(a)(4)(iv).  The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work.  Id.  If the claimant cannot perform his past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id. § 404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to be disabled.  Id.

**C.  SSA Listing 12.05 Standards for Intellectual Disability**

The SSA defines an intellectual disability as one that involves "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  Id. pt. 404(P), app. I, § 12.05.  Paragraph (C) of § 12.05 requires a finding of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

19

imposing an additional and significant work-related limitation of function." Id. pt. 404(P), app. I, § 12.05(C). Paragraph (D) requires "a valid verbal, performance, or full scale IQ of 60 through 70" that leads to the occurrence of at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id. pt. 404(P), app. I, § 12.05(D).

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in (1) improperly assessing and developing the record in regard to Plaintiff's impairments under Listing 12.05(C) or (D) because of a misunderstanding and misinterpretation of the medical expert's opinion and wrongful allocation of weight to medical opinions; (2) failing to assess all severe impairments in contradiction of the record evidence and the Appeals Council remand; and  (3) failing to support, by substantial evidence, the mental RFC determination, the physical RFC determination, and the Step Five determination.  Pl.'s Br. at 5-24.

### A.  Listing 12.05

#### 1. 12.05(C) or (D) Application

Plaintiff first avers that the ALJ wrongly concluded that Plaintiff was not functioning at a significantly subaverage general intellectual level and did not have the adaptive functioning deficits required to satisfy Listing 12.05.  Pl.'s Br. at 6.  According to Plaintiff, the ALJ based this conclusion on medical expert Dr. Efobi's "ambiguous" finding in this area, which is wrongly predicated on the lack of intelligence testing prior to age twenty-two.  Id.  Although these functional deficits must appear before age twenty-two (the developmental period), "evidence of a qualifying deficit in adult cognitive functioning serves as prima facie evidence" for finding those

deficits even without IQ testing before that age, so long as there has been no interfering injury.

Talavera v. Astrue, 697 F.3d 145, 152 (2d Cir. 2012). Plaintiff correctly raises the practice of inferring IQ from later intelligence testing as having been consistent across the individual's whole life, since there may be valid reasons why an adult did not obtain early IQ testing. Id. Plaintiff's full-scale IQ at the age of thirty-six was 62, within the range of the Listing 12.05(C) requirements. 20 C.F.R. pt. 404(P), app. I, § 12.05(C); R. at 392. However, cognitive functioning deficits and adaptive functioning deficits must be established separately. Talavera, 697 F.3d at 148. According to Plaintiff's analysis of the school records, Plaintiff tested far below level. R. at 275. This is consistent with Plaintiff's cognitive limitations that place his IQ within the paragraph (C) requirement. However, just prior to dropping out Plaintiff was achieving passing grades in his classes. R. at 280. Contrary to Plaintiff's assertions, Dr. Efobi did not exclusively rely on the lack of intelligence testing before age twenty-two. R. at 649. After dropping out of high school, Plaintiff worked as a diesel mechanic for a trucking business, at McDonald's, and inserting pages into newspapers. R. at 37. Plaintiff was also briefly self-employed doing lawn-care, and ended the employment due to a lack of equipment, not because of cognitive deficits. R. at 51. Dr. Efobi specifically noted Plaintiff's self-employment with "no significant work-related limitations" as failing to meet the Paragraph (B) requirement of Listing 12.05. R. at 649.

To satisfy the requirements of Paragraph (C), Plaintiff must establish that, along with an IQ within the 60 through 70 range (verbal, performance, or full scale), there must also be "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404(P), app. I, § 12.05(C). Dr. Long concluded that Plaintiff appeared to be "functioning on a below average intellectual level with a limited fund of information," but in her medical source statement she concluded that Plaintiff "was able to follow and understand

simple directions and instructions and to perform simple tasks independently" as well as being "able to maintain attention and concentration and able to maintain a regular schedule." R. at 345. Conversely, Dr. Caldwell reported in her medical source statement that Plaintiff was "limited" in the same areas that Dr. Long had found ability. R. at 390. Unless Plaintiff can establish an additional mental or physical impairment that interferes with a "significant work related . . . function," Plaintiff is ineligible under Paragraph (C). 20 C.F.R. pt. 404(P), app. I, § 12.05(C). Neither Dr. Caldwell nor Dr. Long established interference with a "significant work-related function" and Dr. Efobi, as noted, found that there was none. R. at 649.

Alternatively, Plaintiff argues that Paragraph (D) of Listing 12.05 is satisfied. Pl.'s Br. at 7. Though Plaintiff has established the necessary IQ to fall within the Paragraph (D) range, Plaintiff must also prove at least two of four possible factors: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404(P), app. I, § 12.05(D). Evidence that shows a plaintiff does not meet 12.05(D) includes his or her capability of "understanding and following simple instructions and directions, performing simple tasks, and maintaining attention and concentration." Briggs v. Astrue, No. 09-CV-1422, 2011 WL 2669463, at *2 (N.D.N.Y. July 7, 2011). Other factors in the Paragraph (D) decision were relating "moderately well" to others and handling some stress. Id. Dr. Long reported that Plaintiff had ability in these areas, though there might be some limitations in "learning new tasks, performing complex tasks, and making appropriate decisions." R. at 345. Dr. Long stated that Plaintiff could relate "adequately" to others (with some anxiety), and though he used avoidance, he was capable of "adequate stress management." R. at 345-46. Dr. Caldwell assessed Plaintiff as limited in these areas, but did not note the limitations as "marked," such that

they would satisfy the first three possible criteria of 12.05(D). R. at 390. Dr. Efobi found that none of the four Paragraph (D) criteria were satisfied. R. at 648.

Therefore, the ALJ's decision regarding Listing 12.05 was supported by substantial evidence in the form of Dr. Efobi's opinion and is affirmed.

### 2. Assignment of Weight to Dr. Efobi's Opinion

In light of Dr. Efobi's negative findings in regard to Paragraphs (C) and (D), Plaintiff's remaining argument involves the weight given to Dr. Efobi's opinion. Plaintiff contests the ALJ's decision to give "significant weight" to Dr. Efobi. Pl.'s Br. at 10. The factors for deciding what weight should be given to a non-controlling medical opinion include the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c). The increased presence of these factors typically leads to more weight being given to the medical opinion. Id. § 404.1527(c)(1)-(6). Plaintiff contends that the ALJ wrongly gave "significant weight" because Dr. Efobi never examined Plaintiff, was not a treating physician, and, among other faults, his findings were inconsistent with the record. Pl.'s Br. at 10. However, Plaintiff offers no alternative physicians who must necessarily take precedence over Dr. Efobi, since those who are raised in support of the Listing 12.05 arguments are all non-treating, acceptable medical sources. 20 C.F.R. §§ 404.1502, 404.1513(a); see also SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (explaining that treating sources' opinions may be entitled to controlling weight). Dr. Caldwell was a consultative psychiatrist who conducted an intelligence evaluation. Dr. Long's role was also consultative; she conducted a psychiatric evaluation of Plaintiff. R. at 345. Dr. Efobi determined that Plaintiff had a "possible borderline or mild intellectual disability." R. at 647. Dr. Caldwell diagnosed mild mental retardation. R. at 390. Dr. Long, in contrast, only concluded that she would not rule out "borderline level of intellectual

23

function." R. at 346. Dr. Efobi's findings do not actively contradict either of the disparate views of the consultative doctors and are based on evidence in the record regarding Plaintiff's history. R. at 649.

Dr. Efobi's credentials as a psychiatrist, along with his program and professional expertise, satisfy the specialization factor. R. at 412. As to the supportability factor, Dr. Efobi's findings were recorded briefly. R. at 647-52. However, he did repeatedly reference the ample evidence in the record of Plaintiff's education, employment history, and examination by Dr. Caldwell. R. at 647, 649. One of the "other factors" that the Court may consider is "the extent to which an acceptable medical source is familiar with the other information in [the] case record." 20 C.F.R. § 404.1527(c)(6). Dr. Efobi's findings and references to specifics in the record show familiarity with the other information in the case record. R. at 649. In the absence of treating physicians' opinions, the ALJ did not err in giving Dr. Efobi's opinion significant weight because he satisfied the balance of factors set forth in 20 C.F.R. § 404.1527.

### 3. Development of the Record

Plaintiff argues that the ALJ failed to properly and fully develop the record by relying on Dr. Efobi's ambiguous opinion. Pl.'s Br. at 11. Plaintiff claims that the ALJ has a duty to "adequately develop the record" and re-contact a source "where there is an obvious question." Pl.'s Br. at 12 (citing 20 C.F.R. § 404.1512(e); Rosa v. Callahan, 168 F.3d 72 (2d Cir. 1999); Cruz v. Sullivan, 912 F.2d 8 (2d Cir. 1990)). However, the record does not reflect the existence of an obvious question. As already established, the record provides information on Plaintiff's IQ and adaptive functioning, and Dr. Efobi's opinion was not inconsistent with the record. R. at 649. "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional

information in advance of rejecting a benefits claim." <u>Rosa</u>, 168 F.3d at 79 n.5.  Plaintiff faults Dr. Efobi for relying solely on the lack of testing prior to age twenty-two, but disregards Dr. Efobi's subsequent statements discussing Plaintiff's employment history.  R. at 649; Pl.'s Br. at 10.  Thus, Plaintiff's argument that the ALJ should have developed the record further than Dr. Efobi's opinion and should have administered an additional IQ test cannot compel reversal.  The ALJ did not perceive that the medical record was incomplete or ambiguous and did not disregard the presence of an "obvious question," but instead based his findings on the medical expert's opinion.

Therefore, the ALJ's development of the record is affirmed as proper. The ALJ did not need to seek additional testing or further clarification in regard to Dr. Efobi's opinion.

### B. Severe Impairments

In the Step Two analysis, the issue is whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, lasting for at least twelve months.  20 C.F.R. § 404.1509.  To be severe, an impairment must "significantly limit [Plaintiff's] physical or mental ability to do basic work activities," possibly including general mobility, sensory perception, basic understanding, judgment, interactions in the workplace, and basic changes in the workplace.  <u>Id.</u> § 404.1521(a)-(b).  The state agency reviewing psychiatric examiner, Dr. Apacible, assessed the severity of Plaintiff's mental impairments in a medical source statement.  R. at 359-76.  Plaintiff raises the issues that the Appeals Council addressed in its order, namely, that "the Administrative Law Judge will . . . give further consideration to the nonexamining source opinion made by Dr. M. Apacible . . . and explain the weight given to such opinion evidence."  R. at 501.  As Plaintiff indicates, instead of following this direction, the ALJ reproduced verbatim the portion of his opinion regarding Dr.

Apacible's report, providing no further exploration. R. at 25-26, 420-21. Defendant claims that the ALJ's actions were harmless error and thus do not warrant remand. Def.'s Br. at 11. However, standards for usual harmless error are irrelevant here because the ALJ disregarded the Appeals Council's remand instruction on this point in its entirety. The regulations mandate that "[t]he administrative law judge shall take any action that is ordered by the Appeals Council." 20 C.F.R. § 404.977(b). The ALJ erred in disregarding the explicit instruction of the Appeals Council, and this error warrants remand of the issue of Dr. Apacible's contribution to the record and his assessment of Plaintiff's mental RFC.

Plaintiff also contests the ALJ's alleged failure to designate his impairments as severe based on the evidence of Dr. Long's evaluation and more recent treatment records. Pl.'s Br. at 14-15. Dr. Long observed some anxiety and depression and diagnosed a dysthmic disorder. R. at 343-46. Dr. Long concluded that Plaintiff had "[psychiatric and] cognitive problems which may interfere with his ability to function on a regular basis." R. at 346. From this, Plaintiff argues that the ALJ should have found these impairments to be severe under the Step Two analysis.

However, Plaintiff fails to consider Dr. Long's report that Plaintiff was "able to follow and understand simple directions and instructions and to perform simple tasks independently[; and was also] able to maintain attention and concentration and able to maintain a regular schedule." R. at 345. Based solely on Dr. Long's report, Plaintiff's cognitive deficits do not fall within the requirements of the Step Two analysis, since Dr. Long does not conclusively state that Plaintiff's impairments would "significantly limit [Plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Findings based on Dr. Long's assessment of Plaintiff are affirmed as Dr. Long's findings do not support a finding of severe mental impairments under the Step Two analysis.

Finally, Plaintiff argues that the ALJ was wrong to discount Plaintiff's bipolar disorder as a severe psychiatric impairment on the basis that Plaintiff is non-compliant with treatment and prescriptions. Pl.'s Br. at 15. Plaintiff raises the opinions of Dr. Apacible in regard to Plaintiff's psychiatric impairments as well as more recent reports—specifically, an examination by FNP Hubbard. Id. Nurse practitioners are not "acceptable medical sources," but they can be used to support findings about the severity of impairments and how a plaintiff's work is affected. 20 C.F.R. § 404.1513(d)(1). FNP Hubbard reported that Plaintiff had Bipolar I disorder and referred him for Abilify. R. at 663. Plaintiff argues that the ALJ erred in failing to find this impairment severe based on Plaintiff's failure to consistently treat it. Pl.'s Br. at 15. However, Plaintiff raises SSR 96-7p, which states that an ALJ may not infer from a plaintiff's "failure to seek or pursue regular medical treatment without first considering any explanations . . . or other information" that could provide reasons for these "infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7 (Jul. 2, 1996). Regarding Plaintiff's bipolar disorder, the ALJ stated that "it would appear from [Plaintiff's] testimony that he is compliant with neither regular treatment or prescribed use of his medications. Therefore, it is found that any such actual problem is non-severe." R. at 412. The ALJ did not entertain any reasons for Plaintiff's failure to comply with treatment. Id. Remand may be warranted where an ALJ's credibility analysis relies on Plaintiff's noncompliance with treatment "without adequately considering the explanations provided in the record." Christian v. Colvin, No. 12-CV-587, 2013 WL 5423715, at *11 (N.D.N.Y., Sept. 26, 2013). Here, Plaintiff raises possibilities including "lack of access to free or low cost medical services," lack of insurance, and the existence of the mental impairment itself. Pl.'s Br. at 16. Not only does the ALJ fail to explain his decision in light of such reasons, but Dr. Apacible's opinion is also a key part of the evidence of mental

impairments.  R. at 376, 420-21.  Accordingly, since the ALJ ignored the Appeals Council's instructions by reproducing his decision concerning Dr. Apacible verbatim, the matters of Plaintiff's bipolar disorder and other mental impairments are remanded for compliance with the Appeals Council's instructions.

### C. Substantial Evidence

#### 1. Mental RFC Determination

Plaintiff's primary argument is that the ALJ's RFC determination is not supported by substantial evidence because it is inconsistent with the record.  Pl.'s Br. at 17.  Plaintiff correctly states that Dr. Caldwell's mental RFC medical source statement assessed marked limitations in Plaintiff's ability to understand, remember, and carry out complex instructions and the ability to make judgments on complex work-related decisions.  R. at 392.  Plaintiff also points to that Dr. Long's statement that Plaintiff's cognitive problems "may interfere with his ability to function on a regular basis."  R. at 346.  These arguments are consistent with Plaintiff's overall opposition to the ALJ's reliance on Dr. Efobi.  Defendant argues that the ALJ's reliance on Dr. Efobi is not inconsistent with the record as whole.  Def.'s Br. at 14.  As already established, the ALJ's reliance on Dr. Efobi's opinion was appropriate and not inconsistent with Dr. Long's or Dr. Caldwell's opinions.  Further, "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."  Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013).  Therefore, the ALJ is not bound to be completely consistent with Dr. Caldwell, Dr. Long, or any of the other individual acceptable medical opinions.

Plaintiff also contests the report of Dr. Apacible in regard to Plaintiff's mental RFC.  Pl.'s Br. at 18.  Dr. Apacible found moderate impairments in social functioning and other areas.  R. at

369. While Plaintiff considers that evidence to further strengthen his argument against the ALJ's RFC assessment, Plaintiff also objects to the fact that the ALJ gave considerable weight to Dr. Apacible because Dr. Apacible never examined Plaintiff. Pl.'s Br. at 19. Plaintiff claims that Dr. Apacible based his report on incorrect information because he never considered Plaintiff's documented IQ scores or the other information provided by Dr. Caldwell. Pl.'s Br. at 20.

Regardless of the merits of Plaintiff's contentions in regard to Dr. Apacible's opinion, the ALJ failed to follow the order of the Appeals Council in respect to further exploration of Dr. Apacible's opinion. Therefore, Plaintiff's mental RFC determination cannot be properly assessed on the current evidence and is remanded pending the ALJ's compliance with the Appeals Council's instructions regarding Dr. Apacible's opinion.

### 2. Physical/Exertional RFC Determination

In determining Plaintiff's physical and/or exertional RFC, Plaintiff argues that the ALJ erred in giving significant weight to Dr. Southard's opinion on the ground that the opinion was outdated. Pl.'s Br. at 21. Dr. Southard evaluated Plaintiff in 2011, and Plaintiff claims that his impairments have since worsened. Id. The ALJ, however, has taken Plaintiff's worsening condition into consideration by including "back pain secondary to degenerative disc disease" in the list of Plaintiff's severe impairments. R. at 411. The ALJ continued to give significant weight to Dr. Southard's findings regarding back pain, but the ALJ's decision was clearly influenced by recent medical reports and, despite his statement that the "actual medical evidence for severe chronic back pain is marginal," he considered the degenerative findings to necessitate the classification of the back impairment as "severe." Id. Although Dr. Southard's opinion was reproduced in its original form, it is still relevant as an earlier report of Plaintiff's back impairment, and serves as a starting point to show how the condition worsened. Consultative

opinions like Dr. Southard's can constitute substantial evidence, even if they are in conflict

another physician's report if the consultative opinion is consistent with the record at large. <u>Miles</u>

<u>v. Harris</u>, 645 F.2d 122, 124 (2d Cir. 1981). "The more consistent an opinion is with the record as

a whole, the more weight [will be given] to that opinion." 20 C.F.R. § 416.927(c)(4). Dr.

Southard's opinion is consistent with subsequent medical records in substantial part, and where it

was not, the ALJ accounted for the difference in his updated opinion on remand. R. at 411. Dr.

Southard reported that Plaintiff did not need help moving during the examination. R. at 349. Dr.

Southard further assessed Plaintiff as having no abnormalities of the thoracic spine and full

movement (flexion, extension, and rotary movement) of the cervical spine. R. at 350. Plaintiff's

lumbar spine showed "flexion limited to 40 degrees, full extension, full lateral flexion bilaterally,

and full rotary movement bilaterally" with "[p]oint tenderness" in the lumbar region. <u>Id.</u> There

was no redness or swelling. <u>Id.</u> Three years later, FNP Hubbard reported that Plaintiff's

musculoskeletal exam revealed a "normal range of motion." R. at 662. Plaintiff did exhibit

"tenderness, pain, and spasm" in the lumbar back, but still had "normal range of motion, no bony

tenderness [or] swelling." <u>Id.</u> Plaintiff had a negative straight leg raise and full strength in his

lower extremities. <u>Id.</u>

The ALJ also considered the notes of Dr. John Minor, showing degenerative changes, and

RPA Brian Berry, showing pain treatment and physical therapy. R. at 421-22. Dr. Minor

diagnosed Plaintiff with several issues: lumbar back pain, early degenerative disc disease of the

lumbar spine, herniated lumbar disc, and spondylosis. R. at 699-700. Though not discussed by

the ALJ, Dr. Buckley reported that Plaintiff had "[l]ow back pain, [n]eck pain, [t]horacic and

[l]umbosacral neuritis, [d]egeneration of cervical intervertebral disc, [d]egeneration of lumbar

intervertebral disc, [d]isplacement of cervical intervertebral disc without myelopathy, [and] [d]isplacement of lumbar intervertebral disc without myelopathy."  R. at 716.

Again, the ALJ's ruling need not correspond entirely with a single medical opinion in the record; the ALJ is entitled to weigh all the evidence.  Matta, 508 F. App'x at 56.  In this case, the ALJ took into account the developments of Plaintiff's impairments and analyzed severe impairments as identified by later medical reports, rather than solely relying on the earlier findings of Dr. Southard.  R. at 411.

Here, the ALJ considered Plaintiff's worsened impairment and concluded that he was not disabled.  R. at 423.  Plaintiff contends that Plaintiff is ineligible for sedentary work because of the worsening back impairment, including the fact that Plaintiff claims to be unable to sit for more than fifteen minutes.  Pl.'s Br. at 22-23.  Based on the medical evidence, the ALJ concluded that Plaintiff was capable of sedentary work with possible "reasonable restriction from heavy lifting/carrying" due to recent reports detailing Plaintiff's pain. R. at 422.  The ALJ also noted that pain treatment had proved "somewhat" helpful.  Id.  Plaintiff argues that "[t]here must be some medical support for the ALJ's physical RFC finding" since the ALJ should not "interpret raw medical data in functional terms," and thus without the support of a medical opinion, the ALJ could not conclude that Plaintiff is capable of sedentary work.  Pl.'s Br. at 23 (quoting Blythe v. Astrue, No. 08-CV-104, 2009 WL 425583, at *6 (W.D. Ky. 2009)).

The ALJ acknowledges that there are no new medical source statements for Plaintiff's physical/exertional impairments.  R. at 412.  Defendant correctly notes, however, that while the Commissioner considers medical opinions in the assessment of a plaintiff's RFC, the final decision on the matter rests with the Commissioner.  20 C.F.R. § 404.1527(d)(2); Def.'s Br. at 20.  Furthermore, the Commissioner, and by extension the ALJ, "is entitled to rely on the medical

record and his evaluation of [Plaintiff's] credibility in determining whether [Plaintiff] suffers from disabling pain." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). Here, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." R. at 416. Therefore, it is evident that the ALJ decided Plaintiff's physical/exertional RFC based on the medical record and his own assessment of Plaintiff's credibility. Therefore, the ALJ's finding on this matter is supported by substantial evidence.

### 3. Step Five Determination

Plaintiff's final contention is that the ALJ's Step Five Determination was not supported by substantial evidence because VE Schader, on whom the ALJ relied, did not provide an accurate hypothetical regarding Plaintiff's "full extent of . . . functional limitations." Pl.'s Br. at 23. Defendant counters that this is a "rehashing" of Plaintiff's objection to the ALJ's RFC analysis. Def.'s Br. at 21. However, Plaintiff's objection to the RFC is correct because of the ALJ's failure to follow the Appeals' Council instructions involving Dr. Apacible. Therefore, the mental RFC was not properly assessed, and as such the VE's hypothetical was necessarily flawed by uncertainty. The VE's hypothetical must be consistent with Plaintiff's particular "limitations and capabilities." Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981). Upon remand, the VE must provide a new hypothetical based on a revised mental RFC analysis and the existing physical RFC analysis.

**V.  CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     June 30, 2016
           Albany, New York

           Lawrence E. Kahn
           U.S. District Judge